Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals of the Fourth Circuit are admonished to draw an eye and give their attention, for the Court is now sitting. God save the United States and its Honorable Court. All right, be seated, please. All right, the first case we're going to hear is United States v. Carter. Mr. Coleman. Good morning, Your Honors. It's good to see you again. This is your second time up here on this, isn't it? Yes, sir. Again, I'm Lex Coleman, and I'm continuing to represent Todd Carter on this matter. When the case was last before the Court following oral argument, the judgment was vacated, and the case was... Just a little feedback on the microphone. Is there some possibility to turn down just a touch? Yeah. Okay, great. The case was remanded for the government to have an opportunity to put on evidence showing that disarming habitual marijuana users substantially served the governmental interest of reducing gun violence. The Court didn't just remand it for that purpose. Your opinion, the opinion of this panel, actually gave the government a very thorough and lengthy roadmap, observing that the evidence they were given the opportunity to produce should be abundantly available. The Court pointed to the studies the Seventh Circuit relied on in the Yancey case in 2010 and suggested a number of factual scenarios there would be evidence to support that might show a correlation or a justification for disarming habitual marijuana users. The government didn't seem to really take advantage of all that direction. There was no evidence presented of inflated prices of marijuana, no evidence of financial desperation of habitual marijuana users. Mr. Coleman, you phrased the question as whether or not habitual marijuana users should be disarmed, but I thought we phrased it in a bit more general terms as to whether drug users writ large should be disarmed. Well, I think the facts of the case narrow that further with Mr. Carter, because the only assertion and evidence in this case is that he was an habitual user of marijuana. Well, that happens to be the drug in question, but I don't know that we phrased the issue that narrowly, nor did we require that narrow a fit to have it pertain to a single drug. Well, I think then the reason in our brief we cited the number of state laws showing the different treatment of guns and marijuana, as well as now since then we've had two states legalize the recreational use of marijuana, was not to disagree with policy considerations as Judge Copenhaver interpreted it, but to point out that it's not as simple as that broad a fit. I mean, we can define this so broadly that it's easy to make a reasonable fit with just about anything, and that's really unfortunate if that's what happens, because despite the construction of the core non-core or limited core that has developed in the circuit, we're still dealing with a fundamental right. Do you think that the legalization of marijuana in certain states would override the provisions of 922G3? It's not an overriding, Judge Hamilton, as much as illustrating the really imperfectness of that fit. There's no other drug that's been scheduled that way. Related to alcohol. You can't get out on the highway and drive when you're intoxicated. But we're not taking cars away from marijuana users. We're disarming them. I'm just using that as an analogy. Yes, sir. And the same thing, I don't think the legalization of marijuana would in any way impact 922G3. No, it's going to the analysis of the fit. We're applying intermediate scrutiny. Except the question is, you have to get a little more specific, the question is public safety was the legitimate government purpose. And the question is, in the interest of public safety, did Congress have a justification to disarm people who were drug users or addicts? And the question is, is there some kind of data that supports the notion of disarming drug users and addicts of guns while they're drug addicts and abusers? And it looked to me like the government put on a fair amount of data that showed a correlation between drug use, including marijuana, and increased violence, which would justify Congress's legislating. That's the problem or the difficulty with correlations. All of the studies are consistent in saying that there's no evidence of direct causation. You said you have to have causation. This is a legislative enactment done by Congress, and we're going to require Congress to show a causative line for every enactment they adopt. They have basically said, we find the public safety is advanced by taking guns out of the hands of people who are drug users and drug addicts. And you can start off with the common sense that that sounds to me like it would improve the public safety. We do know there's a correlation, for instance, between drug users spending money or need money in causing crime. The whole debate, the public policy debate about disarming and making drugs legal is to try to avoid that correlation. And we also have these studies that show this correlation that if you fall into one of these classes, there is a higher incidence of violence and gun use. The Harrison study is pretty important. Even the one case you cited, a study, supports that almost twice as much. Well, at the joint appendix on page 60, the Harrison study notes that drug addicts commit few violent offenses. The Oser study at the University of Kentucky, which only talked to 800 probationers out of two probation offices in 30 counties, limited the drug use component of its assessment to alcohol, crack, powder cocaine, and stimulants. All of these studies, the first six that were submitted by the government, and then the other three that were requested by Judge Copenhaver. The McCoy study out of Florida International University focused just on Miami and the use of cocaine and opiates. The Florida State study, the Coos study, which was the sixth one submitted by the government at joint appendix pages 92 through 125, dealt only with users of heroin and opiates, crack, and alcohol. There's a distinction in the studies separating out the use of marijuana, and there's no evidence of propensity of violence for that classification of drug. Well, why don't you go through and do the same analysis with respect to the study's discussion of marijuana? There's as much in the studies that were produced to the court below correlating marijuana with violations. The Oser study doesn't. The Bureau of Justice Statistics, a 2004 report, establishes no showing that habitual marijuana use is related to gun violence. The Harrison study, again, made the express statement that drug addicts commit few violent offenses generally. The 1997 special report by the Bureau of Justice Statistics really tied the majority of violent crimes to abuse of alcohol at joint appendix page 71. The Lahnman paper, I've never understood. It deals with road crashes in France, and no one's disputing that marijuana could intoxicate people just like any other. What about the National Survey on Drug Use and Health, which is a J249 that found that of adults who had been arrested for serious offenses in the past year, almost half had used marijuana in the past year? I mean, I understand that there's evidence pointing to a contrary conclusion, but there's evidence pointing that supports the district court's conclusion. And given that we only need to find a reasonable fit, isn't that enough? Well, that's the concern of when we're using a reasonable fit. I'm not saying it has to be perfect. I'm not going to argue to you. You have ruled it doesn't have to be a perfect fit. But it's still got to substantially serve the purpose, even if we call it preserving public safety. Lacking any evidence that habitual marijuana users are meaningfully contributing to violent crime. Not drug traffickers, just marijuana, habitual marijuana users. To answer your question, this is looking at people already in a prison context. They've been arrested, and as I read the report and the study, yes, it's been used in the past year. But there was also a substantial amount of use of alcohol, methamphetamine, and cocaine. No one's saying that those types of drugs don't increase danger. Judge Diaz points out that legislation uses the word drug, which is a broader classification than just marijuana. It includes marijuana. But the difficulty with your argument is the Harrison report, for instance, actually addressed marijuana and showed an increase, a substantial increase, in users of marijuana from people who did not. And there were other studies in here that talked about the increase, even the Way study did. And your argument is that it was not statistically significant, but it was 1.9 times greater when people were using marijuana. And I think there's a lot of common sense in that, don't you? I mean, we're allowed to look at common sense, legislators are doing that. Well, the common sense I've experienced since I got this case has in many contexts been in conversations with court security officers who used to be in law enforcement. And they ask me about the case, and I tell them a few thoughts. I don't belabor them with the legal details. I guarantee you I've gotten more than once the comment, the boy, I've never had a guy who was stoned that I stopped, get out and try and hit me or pull a gun on me. I've practically had to pull him out of the car. Well, that isn't where the risk goes. It's the observation that we see in case after case where they link guns and drugs, where distributors of marijuana and other drugs protect territories. They protect themselves from being robbed during an illegal transaction. They protect themselves from selling bad stuff, low-quality stuff. There's a lawlessness in the drug trafficking trade, which includes marijuana. And that lawlessness is, in a common sense term, policed by the use of guns. And we see in case after case in these drug cases where people are convicted that guns are involved. And that makes sense. And when that is policed in the drug trafficking context, we have a separate statute that has regularly withstood constitutional scrutiny in 924C of the same section. I understand, but here the question is if you're an addict or a drug user, you're in that trade. You have to get it illicitly. You have to go somewhere to get it. You have to buy it. You have to engage in a transaction. And this whole operation from top to bottom is not governed by any law. It's governed by the law of the street, which is enforced with guns. That's just the common sense of it. Well, the common sense you're pointing to makes the assumption that the gun is going to the purchase. The gun is leaving the home. In this case, while we've distinguished any assumptions, I'm just observing that when we have the drug trade and the participation in the drug trade, a person is participating in an area where he would logically arm himself if he were going to buy drugs, sell drugs, this type of thing. And we see that a lot. Well, you're not seeing any selling drugs in Mr. Carter's park, number one. Number two. Let's stick with the legislation first and see whether Congress had a justification for doing what it did. Well, it's interesting. You look at what justification Congress had. Back in 1968, we had the assassination of a president predating it. And then with Senator Kennedy and then with Malcolm X, we had so much social unrest in this country, Congress passed and amended the Gun Control Act twice. Marijuana was listed expressly in that until... It still is. Well, now it's under... It's still illegal under Title 21 to distribute, traffic in, and possess marijuana. It is, but I think the contextual distinction of where the gun was kept, no matter how much you want to remove Mr. Carter as an individual or class from the Corps, still warrants protection by being in a home. We don't have officers going in on a drug raid. We have no evidence of drugs being sold out of that home. And, yes, I... Well, that's not clear either. What's he doing with scales in his house? What's he doing with the cash that was stashed? It's not altogether clear what his role was. Well, actually, I can clarify that. He had just moved and has presented with the sentencing that cash was there relative to that purpose of making deposits on new utilities and new things setting up living at that house. As far as the scales, I submitted to the court in the second sentencing examples of how users being ripped off wanted to ensure they were getting the amount of marijuana they were intending to buy. The presence of digital scales doesn't allow for fair inference either way. Yes, there are distributors who use them. There are also consumers who use them, so they're not blowing their money, just like you or I might pay attention to our receipt when we purchase something somewhere. So I think it's certainly not clear that he... that his inferences would more go with the limited amount of money and the limited amount of volume that it's not fair to assert that he had any connection to that or that, as you put it in your opinion, he was drifting toward that. The fact that this statute might be over-inclusive and capture somebody in that best-case scenario, why is that a problem? We don't require a perfect fit. But we're disarming people. I'm sorry, even outside the court, doesn't that mean something? Didn't Heller say it means something? I mean, we can talk about the temporal duration. We can talk about all the different aspects the court has previously addressed. Well, we disarm a citizen who's a law-abiding citizen, and we disarm a citizen who's a lawbreaker. And Heller recognized that distinction, and our cases have recognized that distinction in relaxing. We don't eliminate the Second Amendment analysis in the sense that it may be applicable, but we relax the standard which allows Congress to act more freely in an area where we have lawbreakers. My red light's on. You can answer if you wish to answer. Just while looking at intermediate scrutiny, we're still looking at whether there is a substantial service of the governmental end. It doesn't have to be a perfect fit, but it needs to advance it. And in the context of habitual marijuana use, I'm sorry, Your Honors, I still have to posit. These studies go off on stimulants and other things that have a much greater reputation and are known to be much more dangerous and to present episodes of violence where the government's evidence doesn't sustain that with respect to marijuana use. Okay. You have some rebuttal. Mr. Wright. Good morning, Your Honors. May it please the Court. On behalf of the United States, I'm Phil Wright, and we ask this Court to affirm the conviction and judgment and find that the statute is constitutional. We do believe that the appellant stated the issue correctly in his brief, on page 1 of his brief, and that is whether the statute substantially serves an important governmental interest, which is to take guns out of the hands of dangerous people. And we do not agree with the argument that it's much more narrow than that. You should focus, as Mr. Coleman just argued, on marijuana users in particular and Mr. Carter in particular. It only requires a reasonable fit between the statute and the governmental interest, and the studies clearly show a significant correlation between drug use, which is what the statute prohibits and applies to drug users and not just marijuana users, and the incidence of violent crime. And we agree with Judge Niemeyer that the Way study actually cuts against the appellant in this case. There is some language that he could point to, but the study also says that the frequent use of marijuana and alcohol were both significantly associated with violence. That's on page 228 of the appendix. It cites another study by a person named White. Concurrent associations were stronger for marijuana and violence than for alcohol and violence. Frequent marijuana use appears to predict violent behavior, and frequent marijuana use and violence co-occur. That study by itself, Your Honor, would be sufficient for Congress to enact the statute and for you to find that the statute is constitutional. In the earlier opinion, the court, I think, dealt with this issue of being over-inclusive and said that some categorical disqualifications are permissible and Congress is not required to engage in a case-by-case exclusion for people who are not trustworthy with weapons, and that Congress could view illicit drug users as a class and not go into particular drug use. So given that issue and given these studies, we think it's very clear that there is a significant correlation between drug use and violence and that Congress is fully justified in enacting that statute. Has any circuit court found G3 unconstitutional under the Second Amendment? No, Your Honor. Not that I'm aware of. Do you know approximately how many have addressed it? There are at least four that we've cited, and this would be the fifth, hopefully, but I don't have a correct exact number, Your Honor. Ultimately, the Second Amendment does not require Congress, as the ANSI Court stated, to simultaneously allow people to choose between illicit drug use and possessions of firearms. This is a temporal statute. He can, on his own, choose to forego drug use and then he can possess a firearm. He did not do that. He wanted to do it both, have both activities available to him, but he's not allowed to. We ask this Court to affirm. All right. Thank you. Mr. Coleman, do you have anything further? Mr. Coleman, as Judge Diaz pointed out, the 922 G3 refers to the term drug. Do you find any assistance in that legislative history that helps you in your case? As far as the FOPA, Your Honor, and switching from identified drugs to that, the prior opinion of this Court talked about a comprehensive scheme. However, that scheme at this point still takes the position that marijuana has absolutely no medical benefit, and we've submitted evidence to that effect that it does. I would go to we don't take cars away from people who are intoxicated, and I guarantee you statistically the more people killed in car wrecks than by being shot by a gun out of their home. Well, don't you think Congress could have taken the gun out of the hands of drunk people who were intoxicated during the period of their intoxication? During the period of their intoxication, if it was analyzed consistent with the free movement clauses in the Constitution, and they had the evidence, they probably could. Well, in answer to your question, in most states, sometimes after one, if there's a wreck involved, sometimes after two, if there is no wreck involved, the driver's license is revoked. That's not taking his car away from him, but it's depriving him or her of the privilege to drive on the state highways. Right, and I don't disagree with that. Remember John Wayne movies, you know, where the guy comes, he's been in the bar, and he's totally drunk, and he's fighting and everything else, and they take him across the street in the compound, take his guns off, lay him on the table, and put him in the lockup, and when he wakes up a few hours later, five hours or six hours later, they let him out of the lockup, hand him his guns, and off he goes. It sounds to me that's a fairly common-sense notion that when somebody's intoxicated, it would be justified to take his arms from him. Well, that's where... Because the possibilities of his acting irrationally with a gun would be a lot higher as a matter of common sense. Well, that's assuming there's a perceivable impairment that creates that danger, which is different person to person. I'm not encouraging, I mean, I think it's right to do individual by individual, but the courts of rule don't do that. It's supported categorical disarmament. That marijuana increases the correlation with violence over intoxication, alcoholic intoxication. Those studies also show that being poor, being a young black male, being desperate because of addictions to stimulants and opiates, all produce the same result, but we're not trying to disarm young black males, and we're not trying to disarm poor people. Well, they also report neutralized for those characteristics, didn't they, those variables? I don't think they did, but getting to the end of it, because I'm out of time. Well, no, I'm sorry I'm not. I'm concerned, Your Honor, you said in your last opinion and pointed to all the bases it could be considered in winning the constitutionality of something, and you and Judge Kopenhaver both included common sense. A lot of the discussion today has revolved around common sense as opposed to empirical evidence that the case was referred to develop. It's concerning in the sense we're still dealing with a fundamental right, if that's going to largely lead the analysis, given the absence of the, we're talking a general correlation that people in these studies have still not worked out, and they focus entirely on other classes of drugs. In our previous cases, not just our previous decision in this case, but in most of our cases, we talk about looking for just Congress's justification in the congressional history, in studies, in common sense, and in precedence from other courts. Those are the four sources that we look for, and I was just asked, I was bringing up some common sense notions as one of the factors that we can look at. We can also look at the cases. I asked Mr. Wright about the courts of appeals that have considered this same issue, and do you agree with him that they have all upheld the constitutionality of G3? Yes, but only two circuits other than, actually only two circuits after Heller, the Seventh Circuit and the Ninth Circuit. You've got Say and Duggan, Patterson with Fifth Circuit before. No, sir. So that's one of the factors. Judge Hamilton asked you about the legislative history. I guess it's not very informative. It's not informative on those two acts at all. So we still have studies, common sense, and precedence, and that's the only reason I was asking you those questions. Yes, sir. The precedence does not. I was surprised, really surprised, and I hope you would be at the Seventh Circuit looking at these studies and just concluding that, gosh, this really supports things. I didn't pick at the studies, as Judge Copenhaver suggested in his opinion. I think the defects in them should be concerning. If we're going to make it so broad that it's all drugs, then I'll lose. That's pretty difficult because that's the way the statute's written. The way the statute is written, yes, but it's being applied to a whole cross-section of a type of drug that doesn't present the dangers that are sweeping under. You agree that marijuana's a drug, though, don't you? It's called a Schedule I controlled substance. So, again, this empirical data does not show a contribution to drug violence or suggest that by disarming habitual drug users, it's going to reduce drug violence. It certainly does for cocaine users, for methamphetamine users, for opiate users. It just doesn't for marijuana. Thank you. Thank you. We'll come down and greet counsel and then proceed on to our next case.
judges: Paul V. Niemeyer, Albert Diaz, Clyde H. Hamilton